**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **RYAN DRUHOT,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:22-cv-00543** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **JOHN SMITH,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

These matters are before the Court on Defendants' Motion for Summary Judgment (ECF No. 25) and Motion to Strike (ECF Nos. 33, 34).[1] For the reasons set forth below, Defendants' Motion to Strike (ECF Nos. 33, 34) is **DENIED** and Defendants' Motion for Summary Judgment (ECF No. 25) is **GRANTED IN PART and DENIED IN PART**.

**I.     BACKGROUND**

**A.  Factual Background**

This case involves a series of incidents that occurred on or about March 18, 2021, at Madison Correctional Institution ("MaCI"), located in London, Ohio. At the time of the incidents, Plaintiff Ryan Druhot was an inmate at MaCI and Defendants were correction officers employed at MaCI. (*Id.* ¶¶ 4-6). Plaintiff claims that on March 18, 2021, he was physically assaulted by Defendants in three separate areas of MaCI: (1) the Washington Bravo Unit, (2) behind the yard shed, and (3) the infirmary. (*Id.* ¶¶ 8-10). The facts summarized here largely reflect the summary judgment standard, wherein the facts are considered in the light most favorable to Plaintiff, with

---

[1] It appears ECF Nos. 33 and 34 are identical documents.

mention where facts are undisputed or indisputable. *See City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001).

### 1. *Washington Bravo Unit Assault*

Plaintiff feared for his safety in the Washington Bravo Unit, so he went to the dayroom, kicked the dayroom door, laid down on his stomach, and put his hands behind his back. (ECF No. 32 at PageID 559; ECF No. 25-2 PageID 116-117). These combined movements are referred to as a "check-in move," (ECF No. 32 at PageID 559), which Plaintiff hoped would draw the officers' attention so he could be taken to another area of the prison, (ECF No. 25-2 at PageID 119). Responding to Plaintiff's check-in move, Defendants John Doe Corrections Officers 1-5, with the assistance of Officer John Smith, handcuffed Plaintiff. (ECF No. 32 at PageID 559; ECF No. 26 at PageID 367, 368).

After his hands were cuffed behind his back, Plaintiff laid on floor on his stomach for approximately ten seconds before Plaintiff felt "about four of the hardest punches [he has] ever felt to his mouth" and got "knocked out." (ECF No. 32 at PageID 560; ECF No. 1 ¶ 8; ECF No. 25-2 at PageID 117, 122). While the complaint alleges Defendants John Does Corrections Officers 1-5 assaulted Plaintiff in the Washington Bravo Unit, (ECF No.1 ¶ 8), Plaintiff, in his deposition, identified Officer Smith as the one who punched him (ECF No. 25-2 at PageID 123). Plaintiff claims Officer Smith admitted to Plaintiff that he was the one that punched Plaintiff for the several months that followed. (*Id.*). Officer Smith, however, denies assaulting Plaintiff. (ECF No. 25-6 at PageID 292; ECF No. 26 at PageID 369).

Officers Joshua Morehart and Zachary Haynes were working as yard officers at the time the incident began, and they arrived at the Washington Bravo Unit after Plaintiff was handcuffed in order to help Officer Smith escort Plaintiff to the infirmary. (ECF No. 27 at PageID 423, 424).

Plaintiff regained consciousness when he felt pepper spray going down his throat and felt himself being slammed through the door of the Washington Bravo Unit. (ECF No. 32 at PageID 560-561; ECF No. 25-2 at PageID 122). Plaintiff remembers seeing Officer Haynes and saying something to the effect of "please don't kill me, I got a daughter." (ECF No. 25-2 at PageID 122). Officer Haynes does not recall Plaintiff saying that, but conceded that Plaintiff could have said that. (ECF No. 28 at PageID 472). Plaintiff claims Officer Haynes then said, "we are going to kill you when we get you back here, b*tch." (ECF No. 25-2 at PageID 122-123).

While it is undisputed that there are cameras in the Washington Bravo Unit, there is no video evidence available of the incident because, per the Defendants, the footage was not "preserved" as the reviewer "saw nothing that would have required them to save it."[2] (ECF No. 32 at PageID 561; ECF No. 26 at PageID 370; ECF No. 31 ¶ 3; ECF No. 33 at PageID 584; *see* ECF No. 25-9 at PageID 337).

### 2. *Yard Shack Assault*

After the Washington Bravo Unit incident, Plaintiff was escorted on foot to the infirmary by Officers Smith, Morehart, Levinger,[3] and Haynes. (ECF No. 32 at PageID 562; ECF No. 1 ¶¶ 9, 10). While being escorted through the yard, Defendants placed Plaintiff on the ground in front of the yard shack and sprayed him with pepper spray while his hands were handcuffed behind his back. (ECF No. 32 at PageID 562; ECF No. 1 ¶ 10). Officer Morehart admits to administering pepper spray to Plaintiff's face in the yard during Plaintiff's escort to the infirmary, (ECF No. 27 at PageID 432; ECF No. 25 at PageID 61; ECF No. 25-7 at PageID 294), and Officer Haynes

---

[2] Defendants also argue that Plaintiff brought this lawsuit in an attempt to resolve his spoilation case in the Court of Claims. (ECF No. 33 at PageID 584). This Court, however, is not concerned with other cases between the parties or Plaintiff's motivation for filing this lawsuit.

[3] Defendants' position is that Officer Matthew Levinger could not have escorted Plaintiff to the infirmary because he was the only officer working at the infirmary at that time and could not leave his post. (ECF No. 25 at PageID 55).

confirmed the use of pepper spray, as he was also contaminated by the spray, (ECF No. 28 at PageID 467). Defendants claim the pepper spray was necessary to gain compliance because Plaintiff was kicking his legs, spitting at officers, and disobeying verbal directives to stop resisting. (ECF No. 25 at PageID 61; ECF No. 26 at PageID 372; ECF No. 27 at PageID 432, 434). Officer Morehart contends, though, that the pepper spray had no effect on Plaintiff. (ECF No. 25-7 at PageID 294). At some point, Plaintiff was put in leg irons, though it is unclear whether this occurred before or after he was pepper sprayed. (ECF No. 26 at PageID 362).

Unlike the Washington Bravo Unit, there is no video evidence of the incident behind the yard shack because that area does not have cameras. (ECF No. 32 at PageID 562). Defendants claim they chose that area to put Plaintiff down because it was grassy as opposed to pavement. (ECF No. 26 at PageID 373). There is video, however, of Plaintiff being escorted through the yard to the yard shack. (ECF No. 23, Disc 1). Despite that this video does not have any sound, is zoomed far out, freezes at times, and bounces up and down, this Court is hard-pressed to agree that Plaintiff was being combative at this time based on the footage. From what this Court can tell, a person in a white shirt (presumably Plaintiff) was being escorted by personnel in dark clothing on both sides of him (presumably Defendants). It is hard to tell whose legs are whose. At one point, Plaintiff seems to be leaning back with his legs extended straight out. At another point, it appears Plaintiff is either bending his legs behind him towards his buttocks or lifting his knees up towards his chest. From this Court's perspective, this video does not reveal any violent behavior by Plaintiff.

### 3. *Infirmary Assault*

After the incident behind the yard shack, Defendants claim Plaintiff continued to kick his feet and disobey directives from the officers, at times going "dead weight," so they needed to call a nurse to bring a motorized vehicle—referred to as a "golf cart," "medical cart," or "gator"—to

help take Plaintiff to the infirmary. (ECF No. 25 at PageID 61; ECF No. 25-6 at PageID 292, 295). When the motorized vehicle arrived at the infirmary, the officers carried Plaintiff inside. (ECF No. 32 at PageID 563). There is video footage of Plaintiff being carried into the infirmary. (*Id*.; ECF No. 23, Disc 2). While this video does not have any sound and is somewhat grainy, the video reveals Plaintiff in a limp state being carried, or otherwise dragged, in by officers. Plaintiff's hands continue to be handcuffed behind his back and he appears to be in leg irons. He is not wearing a shirt but has pants on, and his feet are bare.[4] Upon approaching a room, officers pick up Plaintiff's feet and carry him into the room face first in a horizontal position.

When Plaintiff first arrived at the infirmary, he was characterized by medical staff as "unresponsive," "disoriented," "sluggish," "weak," "unstable," and having a "decreased level of consciousness." (ECF No. 25-2 at PageID 221, 224). Specifically, he had slow and shallow breathing, his gait was weak and sluggish, his skin was pale and clammy, his pupils were large, his speech was slurred, his oxygen saturation level was 70%, his pulse was 30 beats per minute, and he was unable to stand still. (*Id*. at PageID 221, 222, 224, 225). Medical staff initially called 911 due to Plaintiff's severe hypoxia[5] and proceeded to administer one dose of Narcan,[6] but Plaintiff's oxygen levels dropped to 55%. (*Id*. at PageID 223, 224). After medical staff administered a second dose of Narcan, Plaintiff fully regained consciousness, so the 911 call was canceled. (*Id*.). Medical staff noted Plaintiff said he smoked some "tuns,"[7] but the nurse could not fully assess Plaintiff because "he was combative and belligerent," though the staff does not describe what exactly Plaintiff was doing. (*Id*.).

---

[4] This Court has no details as to where Plaintiff's shirt and shoes went.

[5] Hypoxia is low levels of oxygen in a person's body tissues. *Hypoxia*, Cleveland Clinic, my.clevelandclinic.org/health/diseases/23063-hypoxia (last visited Dec. 4, 2023).

[6] Narcan is "a life-saving medication that is used to reverse the effects of a drug overdose." (ECF No. 25-4 ¶ 9).

[7] "Tuns" or "tunes" is a term used for an illegal drug that is received and distributed by inmates. (ECF No. 25-4 ¶ 12).

At some point after Plaintiff allegedly became combative in the infirmary, Officer Levinger pepper sprayed Plaintiff's face and punched him three to four times in his stomach. (ECF No. 25-1 at PageID 85-86). While being pepper sprayed, Plaintiff was laying on the floor on his stomach with his hands still handcuffed behind his back, and possibly in leg irons.[8] (*Id.*, at PageID 85, 90). When Officer Levinger punched Plaintiff in the stomach, Plaintiff's hands and legs were in the same position as before, but Plaintiff was seated instead of laying down. (*Id.* at PageID 86). Defendants claim Officer Levinger's actions in the infirmary were necessary because Plaintiff continued to kick his legs and spit at officers and medical staff. (ECF No. 25 at PageID 61-62; ECF No. 25-1 at PageID 85).

Plaintiff remembers waking up in a cell in the infirmary naked, covered in blood and pepper spray. (ECF No. 25-2 at PageID 133). A nurse noted Plaintiff had a "swollen and black left eye, [black] right eye, [and] broken front tooth." (*Id.*, at PageID 226). Plaintiff also had multiple scratches and blood on his face. (ECF No. 32 at PageID 565; ECF No. 25-2 at PageID 223, 226; ECF No. 29 at PageID 505). Plaintiff was not able to stand still and his speech was sluggish. (ECF No. 25-2 at PageID 226). Plaintiff told a nurse that "it feel[s] like my lungs have been punctured." (*Id.*). No pictures of Plaintiff's injuries were taken or have been produced. (ECF No. 32 at PageID 566; ECF No. 31 ¶ 4). Plaintiff, however, needed dental work to fix his teeth. (ECF No. 25-2 at PageID 141, 214-217; ECF No. 31-1). Additionally, Plaintiff claims because of the incident, he suffers from post-traumatic stress disorder ("PTSD"), depression, anxiety, and paranoia. (ECF No. 25-2 at PageID 153-154; ECF No. 32 at PageID 571). Plaintiff sought psychiatric help due to his emotional trauma from this incident. (ECF No. 25-2 at PageID 154; ECF No. 31-2).

---

[8] Officer Levinger states Plaintiff may have been in leg irons when he administered pepper spray to his face in the infirmary. (ECF No. 25-1 at PageID 93, Line 21).

## B. Procedural History

Based on the officers' use of force during these incidents, MaCI Lieutenant Sarah Bankers compiled a "use of force" packet. (ECF No. 25-9 at PageID 326). The Ohio Department of Rehabilitation and Correction ("ODRC") then conducted an investigation, during which ODRC concluded the force used in this case was justified and appropriate under the circumstances. (ECF No. 25 at PageID 56; ECF No. 25-2 at PageID 174-213). The investigation, however, was limited to the footage of the incident in the yard and the infirmary, and did not look into the incident in the Washington Bravo Unit. (ECF No. 25-9 at PageID 334-339; ECF No. 32 at PageID 562). This was so because, in the words of Lieutenant Bankers, "handcuffing an inmate is not a use of force" so "the use of force was not considered to have happened in Washington Bravo." (ECF No. 25-9 at 335). Additionally, the investigation did not focus on whether Plaintiff was non-compliant, kicking and spitting towards officers and staff. (ECF No. 32 at PageID 568; ECF No. 30 at PageID 543).

Once Plaintiff was released from the "hole," approximately nine days after the assaults, Plaintiff filed a grievance through MaCI's kiosk system. (ECF No. 30-1; ECF No. 25-2 at PageID 142). Plaintiff's grievance stated, in pertinent part: "On March 18th in the evening time, after I was already handcuffed on the ground on my stomach, they knocked my teeth out … I woke up naked with my teeth knocked out and both my eyes swollen shut and much more injuries to my entire body … all of those injuries occurred after I was handcuffed on my stomach." (ECF No. 32 at PageID 567; ECF No. 30-1 at PageID 552). Plaintiff claims his grievance was not fully looked into by MaCI staff or ODRC. (ECF No. 32 at PageID 567; ECF No. 30 at PageID 530-531).

Plaintiff subsequently filed a 42 U.S.C. § 1983 action alleging excessive force in violation of the Eighth Amendment, (*id*. ¶¶ 14-17), in response to which Defendants denied all the

allegations, (ECF No. 16). Relevant here, Defendants then filed a motion for summary judgment arguing that, throughout the incidents, Plaintiff was under the influence of an intoxicating substance that caused him to be combative and belligerent and to experience bouts of unconsciousness. (ECF No. 25 at PageID 55). Plaintiff, however, denies using drugs and was found not guilty of violating MaCI's rule against drug usage. (ECF No. 32 at PageID 566; ECF No. 25-2 at PageID 146). Regardless, Defendants claim the officers' uses of force Plaintiff were the least amount necessary to protect Plaintiff from a potentially lethal drug overdose, and to protect inmates and staff from Plaintiff who was kicking his legs, spitting at officers, and disobeying verbal directives to stop resisting. (ECF No. 25 at PageID 55, 61).

In response to Plaintiff's opposition to Defendants' motion for summary judgment, (ECF No. 32), Defendants moved to strike an affidavit from Plaintiff's Attorney, Konrad Kircher, and its exhibits, (ECF Nos. 33, 34). This affidavit provides, among other things, that: (1) Mr. Kircher has been representing Plaintiff both prior to litigation and throughout this litigation with regard to his claims of excessive force; (2) Plaintiff's counsel sent a public records request to ODRC for all materials relating to this incident and received only the same video Defendants' counsel filed with the Court; (3) Plaintiff's counsel requested video of the incident in the Washington Bravo Unit to which Defendants responded that no video was saved because there was no use of force reported inside the Washington Bravo Unit; and (4) no photographs of Plaintiff's injuries have been produced in this case. (ECF No. 31). Plaintiff's counsel attached two exhibits to the affidavit: (1) two pages from Plaintiff's prison dental records relating to this incident (ECF No. 31-1); and (2) a page from Plaintiff's psychiatric treatment records with Recovery Services relating to his mental and emotional injuries from this incident (ECF No. 31-2).

After briefing on the motion to strike concluded, this Court held oral arguments on both the motion to strike and the motion for summary judgment. Both motions are now ripe for this Court's consideration.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018). The court's function at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court thus asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). Ultimately, "summary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Said differently, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," but evidence that is "merely colorable" or "not significantly probative" is not enough to defeat summary judgment. *Id.* at 249-50.

Importantly, at the summary judgment stage, the court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Accordingly, at this stage in the litigation, this Court must accept Plaintiff's version of events without weighing the evidence or

assessing the credibility of prospective witnesses. *See Cordell v. McKinney*, 759 F.3d 573, 578 (6th Cir. 2014).

## III.    LAW & ANALYSIS

### A.  Motion to Strike

Prior to reaching the substantive arguments raised in Defendants' motion for summary judgment, this Court will first address Defendants' motion to strike. *See Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005).

As a threshold matter, the 2010 amendments to the rules governing summary judgment rendered motions to strike inappropriate at the summary judgment stage, directing parties to instead file an objection. *See Smith v. Interim HealthCare of Cincinnati, Inc.*, No. 1:10-cv-582, 2011 WL 6012971, at 4 (S.D. Ohio Dec. 2, 2011) (citing Fed.R.Civ.P. 56(c)(2); *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *1 (W.D. Mich. Oct. 31, 2011)). Accordingly, this Court construes Defendants' motion to strike as objections under Rule 56(c)(2).

A court may only consider admissible evidence in ruling on a motion for summary judgment. *Wiley v. United States*, 30 F.3d 222, 226 (6th Cir. 1994). If one party takes issue with another party's summary judgment evidence, that party may file an objection. Fed. R. Civ. P. 56(c)(2). An objection functions as an assertion "not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." *B&S Transp., Inc. v. Bridgestone Ams. Tire Operations, LLC*, No. 5:13-cv-2793, 2016 WL 1089394, at *13 (N.D. Ohio Mar. 21, 2016) (quoting *ForeWord Magazine, Inc.*, 2011 WL 5169384, at *2). It is the opponent's—the objecting party's—burden to identify exactly what they believe should be excluded. *Wilson v. Budco*, 762 F. Supp. 2d 1047, 1057 (E.D. Mich. 2011). The court may, then, allow the proponent an opportunity to support or

address the fact or "propose a method for doing so at trial." *See ForeWord Magazine, Inc.*, 2011 WL 5169384 at *6; Fed. R. Civ. P. 56(e).

Here, Defendants argue the records contained in the exhibits attached to the affidavit are not properly authenticated and are hearsay as, in their view, Mr. Kircher neither created the documents based upon personal knowledge nor acted as a custodian or keeper of the records. Additionally, Defendants argue Mr. Kircher cannot offer a professional opinion on Plaintiff's dental or mental health conditions and that the exhibits circumvent Plaintiff's obligations with respect to expert witnesses.

Plaintiff responds that the dental records were properly authenticated through discovery and are no different than Plaintiff's medical records that Defendants attached to their motion for summary judgment. (*See* ECF Nos. 25-2, 25-3). Further, Plaintiff argues the mental health records were accompanied by disclosure of Nora Elsworth with Recovery Services who will testify at trial as to Plaintiff's mental health conditions. In Plaintiff's view, at this stage, the records are meant to counter Defendants' claim in their motion for summary judgment that Plaintiff's injuries are *de minimis*.

To authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Where a document is produced in discovery, however, courts have found there is sufficient circumstantial evidence to support its authenticity at trial. *Churches of Christ in Christian Union v. Evangelical Ben. Trust*, No. 07-cv-1186, 2009 WL 2146095 at * 5 (S.D. Ohio July 15, 2009). Here, the dental records were produced in discovery by Defendants' employer, ODRC, and the mental health records were produced in discovery by Plaintiff and accompanied with disclosure of Nora Elsworth with Recovery Services who will testify about Plaintiff's mental health. (ECF No. 35 at PageID 618;

11

ECF No. 35-1). Under the circumstances presented, the exhibits are authenticated and admissible at this stage in the proceedings.

In terms of Defendants' hearsay arguments, while the exhibits are hearsay in their current form, they can be admissible at trial under the business record exception in Federal Rule of Evidence 803(6): At trial, Plaintiff can call the prison dentist and Plaintiff's therapist at Recovery Services, and/or the custodian of the records, to testify that the records were made at or near the time by a person with knowledge, kept in the course of a regularly conducted business activity, and made as part of a regular practice of the business. Accordingly, this Court overrules Defendants' objections to the exhibits attached to Mr. Kircher's affidavit.[9] (ECF Nos. 31-1, 31-2).

As for Mr. Kircher's affidavit, it must be made on "personal knowledge, set out facts that would be admissible in evidence, and show that the affiant … is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In this context, personal knowledge means "personal observations or experiences." *Alexander v. Kellogg USA, Inc.*, 674 Fed. Appx. 496, 499 (6th Cir. 2017). An affiant's "statement … based upon his 'belief' … [does] not demonstrate the personal knowledge required by [Rule 56]." *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007). But here, Mr. Kircher has personal knowledge of what he asserts in the rest of the paragraphs within the affidavit and he states specific facts rather than mere conclusions. Therefore, this Court **OVERRULES** Defendants' objections and **DENIES** Defendants' motion to strike (ECF No. 33).

### B. Motion for Summary Judgment

On to the substance. The maintenance of prison security and discipline may necessarily subject prisoners to physical contact, but such conduct is not without regulation: "[A] violation of the Eighth Amendment will nevertheless occur if the offending conduct reflects an unnecessary

---

[9] The records may also be admissible under Federal Rule of Evidence 803(4), an exception to the rule against hearsay for statements made for medical diagnosis or treatment.

and wanton infliction of pain." *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995) (citing *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993)) (cleaned up). As the Sixth Circuit has recognized, "the limits of [the Eighth Amendment] are not easily or exactly defined, but … broad and idealistic concepts of dignity, civilized standards, humanity, and decency are useful and usable." *Cordell*, 759 F.3d at 588 (citing *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)) (internal quotation marks omitted).

Defendants make several arguments for summary judgment, which are evaluated in turn below, along with Plaintiff's rebuttals.

### 1. Excessive Force

This Court first turns to Defendants' argument that Plaintiff fails to articulate an excessive force claim. To succeed on an excessive force claim under the Eighth Amendment, Plaintiff must satisfy both a subjective and objective component. *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011).

### a. Subjective Component

The subjective component of an excessive force claim is concerned with the officer's state of mind, asking "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*. (citing *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). In determining whether an officer had a culpable statement of mind, courts consider "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted, as well as the extent of the threat to the safety of staff members and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Cordell*, 759 F.3d at 581 (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)) (internal quotation marks omitted).

Defendants argue Plaintiff fails to satisfy the subjective component because the evidence shows Defendants did not act maliciously or sadistically, but rather acted to save Plaintiff from a potentially lethal overdose, restore discipline, and protect officers and staff. As an initial matter, this Court is not concerned with whether Plaintiff was intoxicated; this Court is concerned with the intent behind Defendants' actions.

While Defendants argue Plaintiff was combative—such as by kicking his legs, spitting, and generally resisting—at this stage of the litigation, this Court must take Plaintiff's version of events as true, and Plaintiff contests this contention. Even if Plaintiff were combative, though,[10] this Court struggles to understand how the Defendants' actions were for the purpose of potentially saving Plaintiff's life or to regain discipline and protect officers and staff, including but not limited to: punching Plaintiff in the face multiple times and spraying him with pepper spray in the Washington Bravo Unit while he was immobile on his stomach with his hands handcuffed behind his back; pepper spraying Plaintiff in the yard while he was immobile on the ground, with his hands still handcuffed behind his back, and after he had already been pepper sprayed once; pepper spraying Plaintiff in the infirmary while he was immobile on the ground, with his hands still handcuffed behind his back, possibly in leg irons, after he had already been pepper sprayed at least once, and shortly after he was in an unconscious and unresponsive state; and punching Plaintiff in his stomach multiple times while he was in a seated position, with his hands still handcuffed behind his back, with his legs in leg irons, after he had already been pepper sprayed at least two times, and shortly after he was in an unconscious and unresponsive state.

---

[10] It is worth noting that, when taking Plaintiff's version of the assault while he was in the Washington Bravo Unit as true, it is reasonable to conclude Plaintiff was spitting and kicking his legs thereafter because pepper spray had gone down his throat and he was afraid the officers would kill him after they punched him in his face, pepper sprayed him, and slammed him through a door without provocation.

Furthermore, despite video footage not being preserved or available for at least one of the incidents, Plaintiff's allegations are corroborated by other evidence, such as: Officer Haynes admitting Plaintiff may have begged officers not to kill Plaintiff while he was in the Washington Bravo Unit; video footage of Plaintiff being escorted through the yard, albeit poor quality, revealing no violent behavior by Plaintiff; Officer Morehart admitting to pepper spraying Plaintiff behind the yard shack; video footage showing Plaintiff being carried into the infirmary in a limp state; medical records showing Plaintiff was in an unconscious and unresponsive state when he arrived at the infirmary; Officer Levinger admitting to spraying Plaintiff with pepper spray and punching him in the stomach in the infirmary; and medical, dental, and mental health records stating Plaintiff had shortness of breath, blood on his face, swollen and black eyes, multiple scratches on his face, and injury to his teeth, and has suffered from continuous emotional trauma, including PTSD.

Based on the evidence, there is a genuine question of material fact regarding whether Defendants acted maliciously and sadistically to cause harm to Plaintiff. In particular, the record contains evidence that Plaintiff's injuries were severe, indicating that the officers used a substantial amount of force. Additionally, it is difficult to reconcile Plaintiff's alleged noncompliance with the amount of force that Defendants used. During all of the assaults, Plaintiff's hands were handcuffed behind his back and he was either laying on the ground or in a seated position, and for several of the assaults, Plaintiff was in leg irons and had already been blinded and incapacitated by pepper spray. Further, there is no evidence in the record that Defendants made any effort to moderate the force they used against Plaintiff except for bare assertions that the force used was the minimum amount necessary. Therefore, a reasonable jury could find that Defendants lacked a

good-faith basis for the amount of force used, so summary judgment on the subjective component of Plaintiff's Eighth Amendment claim is **DENIED**.

### b. Objective Component

The objective component of an excessive force claim evaluates whether the pain inflicted is "sufficiently serious," as the Eighth Amendment's prohibition "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327). Analyzing the objective component of an excessive force claim is a "contextual" inquiry that is "responsive to contemporary standards of decency." *Id*. at 8-9 (cleaned up). In the prison context, for example, "[a]n inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (internal quotation marks and citation omitted). It is not required, however, that a plaintiff have *significant* injury. *Hudson*, 503 U.S. at 9 (emphasis added).

Defendants argue Plaintiff fails to satisfy the objective component of his excessive force claim because his alleged physical injuries were *de minimis* and, therefore, Plaintiff's alleged mental and emotional injuries are statutorily foreclosed, as "[n]o Federal civil action may be brought by a prisoner … for mental or emotional injury suffered while in custody without a prior showing of physical injury[.]" 42 U.S.C. § 1997e(e).

Even without pictures, Plaintiff's injuries cannot be said to be *de minimis*. Medical records show that Plaintiff had swollen and black eyes, multiple scratches on his face, and blood on his face, and dental records reveal that Plaintiff's teeth were broken and needed to be repaired by the prison dentist. Further, Plaintiff's grievance stated he had injuries to his entire body. Such injuries

are distinguishably more serious than the cases cited by Defendants,[11] and the Supreme Court has found that injuries similar to Plaintiff's—such as an inmate's bruises, swelling, loosened teeth, and cracked dental plate and an inmate's bruised heel, back pain, and other injuries requiring medical treatment—reach the Eighth Amendment's threshold. *See, e.g.*, *Hudson*, 503 U.S. at 10; *Wilkins*, 559 U.S. at 40. Under these circumstances, this Court finds a reasonable jury could conclude that Plaintiff suffered severe pain that objectively violated our contemporary norms of human dignity. As such, Plaintiff's claims for mental and emotional injury, including PTSD, depression, anxiety, and paranoia, are not barred, and summary judgment on the objective component of Plaintiff's Eighth Amendment claim is **DENIED**.

### 2. Individual Liability

This Court next turns to Defendants' argument that Plaintiff fails to establish which officers specifically caused his injuries.[12] To hold an officer liable for the use of excessive force, the officer must have: (1) actively participated in the use of excessive force; (2) supervised the officer who used excessive force; or (3) owed the victim a duty of protection against the use of excessive force. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). As to this third prong, there must be a showing that the officer observed or had reason to know that excessive force would be or was being used and had both the opportunity and

---

[11] Specifically, Defendants cite to *Jones Bey v. Johnson*, 248 Fed. App'x. 675, 677 (6th Cir. 2007) (pain and swollen wrists resulting from tight handcuffs and striking a food slot are de minimis injuries under the Eighth Amendment); *Bullocks v. Hale*, 478 F. Supp. 3d 639 (S.D. Ohio 2020), *aff'd*, No. 20- 3428, 2021 WL 1578198 (6th Cir. Mar. 1, 2021) (finding swelling and bruising to be relatively minor injuries that do not satisfy the objective prong for excessive force); *Matthews v. Copeland*, 286 F. Supp. 3d 912, 916 (M.D. Tenn. 2017) (granting summary judgment to defendants in part because the plaintiff's injuries from ankle shackles, including swelling and lacerations, were too de minimis to support Eighth Amendment claim); *Peterson v. Johnson*, No. 1:09-cv-225, 2011 WL 1627924, at *6 (W.D. Mich. 2011) ("Minor injuries such as bruises and swelling are generally insufficient to support a claim under the Eighth Amendment's Cruel and Unusual Punishments Clause.") (citing *Silguero v. Acheson,* No. 7:08-cv-201, 2009 WL 56341, at * 2 (N.D. Tex. Jan. 9, 2009) (collecting cases)).

[12] As a threshold matter, it is easy for this Court to understand why Plaintiff has a difficult time clearly identifying which officers assaulted him considering temporary blindness is one of the expected incapacitating effects of pepper spray. *See Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994).

the means to prevent the harm from occurring. *Turner*, 119 F.3d at 429. Overall, each officers' liability must be assessed individually based on their own actions. *Binay*, 601 F.3d at 650; *see also Batson v. Hoover*, 355 F. Supp. 3d 604, 614 (E.D. Mich. 2018) ("[I]t is axiomatic that the plaintiff must prove the personal liability of each named defendant by proof of their individual wrongful conduct in order to prevail in a 1983 case.") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). This Court addresses each officer in turn.

### a. Officer Smith

Plaintiff identified Officer Smith as the one who punched him in the face while he was on the ground on his stomach with his hands handcuffed behind his back in Washington Bravo Unit. Officer Smith confirmed that he was present in the Washington Bravo Unit at the time and helped handcuff Plaintiff. While Officer Smith denies assaulting Plaintiff, and Officers Morehart and Haynes state they never saw Officer Smith assault Plaintiff, the evidence suggests Officers Morehart and Haynes did not arrive until after Plaintiff was handcuffed. Therefore, there is enough evidence in the record to permit a jury to conclude that Officers Morehart and Haynes could not have seen Officer Smith assault Plaintiff had he done so. Accordingly, this Court finds there is a genuine dispute regarding whether Officer Smith actively participated in the use of excessive force in the Washington Bravo Unit.

Additionally, Officer Smith was present when Plaintiff was allegedly pepper sprayed in the Washington Bravo Unit and slammed through the door, as well as when Plaintiff was pepper sprayed behind the yard shack. Since Officer Smith observed excessive force being used and had both the opportunity and the means to prevent the harm from occurring, there is also a genuine question as to whether Officer Smith owed Plaintiff a duty of protection against the use of excessive force. Accordingly, summary judgment with respect to Officer Smith is **DENIED**.

### b. *Officer Morehart*

Officer Morehart admits to pepper spraying Plaintiff in the yard while he was on the ground with his hands handcuffed behind his back, which occurred after Plaintiff was allegedly punched in the face, "knocked out," pepper sprayed, and slammed through the Washington Bravo Unit door. The video footage, again, albeit poor quality, reveals no violent behavior on Plaintiff's behalf leading up to being placed on the ground behind the yard shack. As such, a reasonable jury could find that Officer Morehart actively participated in the use of excessive force, so summary judgment with respect to Officer Morehart is **DENIED**.

### c. *Officer Levinger*

Defendants argue that because Officer Levinger was the only officer on shift at the infirmary at the time of the incidents, he could not have been present for the alleged assault in the Washington Bravo Unit or behind the yard shack. Plaintiff, however, only filed one excessive force claim, rather than separate claims for each incident, and Officer Levinger admitted to deploying pepper spray to Plaintiff's face in the infirmary while Plaintiff was immobile on the ground with his hands cuffed behind his back and possibly in leg irons. Officer Levinger also admitted to punching Plaintiff in his stomach multiple times while he was in a seated position with his hands handcuffed behind his back and in leg irons. Officer Levinger's actions occurred shortly after Plaintiff arrived at the infirmary in an unconscious and unresponsive state and shortly after Plaintiff had been allegedly punched in the face, "knocked out," slammed through a door, and pepper sprayed multiple times. As such, this Court finds a genuine question as to whether Officer Levinger actively participated in the use of excessive force. Accordingly, summary judgment with respect to Officer Levinger is **DENIED**.

*d.  Officer Haynes*

Plaintiff argues Officer Haynes actively participated in the assault behind the yard shack. This Court finds there is no evidence that Officer Haynes actively participated in the deploying of the pepper spray in the yard since Officer Morehart admitted he was the one who deployed the pepper spray. But there is a genuine question regarding whether Officer Haynes owed Plaintiff a duty of protection against Officer Morehart's excessive force given that Officer Haynes" (1) was near Officer Morehart while they were escorting Plaintiff across the yard; (2) presumably observed excessive force being used; and (3) had both the opportunity and the means to prevent the harm from occurring.[13]

Additionally, Plaintiff remembers seeing Officer Haynes when he was pepper sprayed and slammed through the door in the Washington Bravo Unit. Officer Haynes confirms he was at the Washington Bravo Unit at that time to transport Plaintiff to the infirmary and that Plaintiff may have said "please don't kill me, I got a daughter." While it is unclear who committed the assaults after Plaintiff was allegedly "knocked out," the evidence reveals that a reasonable jury could conclude that Officer Haynes owed Plaintiff a duty of protection in the Washington Bravo Unit. As such, summary judgment with respect to Officer Haynes is **DENIED**.

*e.  John Does Corrections Officers 1-5*

Plaintiff also alleges he was assaulted by Defendants John Does Corrections Officers 1-5 while in the Washington Bravo Unit. Plaintiff, however, stated in his deposition that it was Officer Smith who assaulted him in the Washington Bravo Unit. Even in a light most favorable to Plaintiff,

---

[13] This case is distinct from *Wright v. City of Euclid, Ohio*, where video footage distinctly showed an officer did not have the opportunity and means to prevent another officer from pepper spraying the plaintiff because the officer was occupied trying to gain control of the plaintiff. 962 F.3d 852, 872 (6th Cir. 2020). Here, the video footage does not capture Plaintiff being pepper sprayed behind the yard shack, but it does show the close proximity of the officers leading up to the incident and the Plaintiff's demeanor.

there is not enough evidence before this Court to find a dispute about whether Defendants John Does Corrections Officers 1-5 owed Plaintiff a duty of protection against the use of excessive force by Officer Smith. Additionally, there is no evidence that Defendants John Does Corrections Officers 1-5 were the ones who pepper sprayed and/or slammed Plaintiff through the Washington Bravo Unit door. Therefore, summary judgment with respect to John Does Corrections Officers 1-5 is **GRANTED**.

### 3. Plaintiff's Own Conduct

Defendants also argue Plaintiff could have plausibly caused his own injuries through his combative behavior. This Court fails to logically understand, however, how—even assuming arguendo that Plaintiff may have kicked his feet and spit—Plaintiff could have inflicted the resulting injuries on himself, including swollen and black eyes, scratches on his face, blood on his face, and "knocked-out" teeth. Therefore, this Court is unpersuaded by this argument, and need not consider it further.

### 4. Qualified Immunity

This Court next turns to Defendants' claim that because Plaintiff cannot prove that any of Defendants' conduct amounted to excessive force, they are entitled to qualified immunity. Qualified immunity shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Said differently, "qualified immunity shields an officer from suit when he or she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances that the officer confronted." *Roberson v. Torres*, 770 F.3d 398, 405 (6th Cir. 2014) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

The question of whether an officer acted reasonably must be decided "in light of the specific context of the case, not as a broad general proposition." *Id.* (quotation marks and citation omitted).

In determining whether qualified immunity applies, the court employs a two-step analysis, in which it must determine: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated; and (2) whether that right was clearly established." *Id.* (citing *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009)) (quotation marks omitted). In this context, "clearly established" requires that "at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "The right's contours [need to be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Cordell*, 759 F.3d at 587 (citing *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014)) (internal quotation marks omitted). If, however, there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, "then there naturally is a genuine issue of fact with respect to whether a reasonable jail official would have known such conduct was wrongful." *Id.* at 588 (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 642 (6th Cir. 2001)).

The Sixth Circuit has long held that macing an unresisting, handcuffed prisoner without provocation, and not in response to any plausible disciplinary exigency, is an unreasonable use of force, such that one is not entitled to qualified immunity for so doing. *Batson*, 355 F. Supp. 3d at 614 (collecting cases).[14] Additionally, the Sixth Circuit has "long recognized that a spontaneous

---

[14] Specifically, *Batson v. Hoover* cites to *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 540 (6th Cir. 2015) ("At the time of the incident [in February 2004], pretrial detainees had a clearly established right not to be gratuitously assaulted while fully restrained and subdued.") (Fourteenth Amendment); *Roberson v. Torres*, 770 F.3d 398, 407 (6th Cir. 2014) ("[U]sing a chemical agent in an initial attempt to wake a sleeping prisoner, without apparent necessity and in the absence of mitigating circumstances, violates clearly established law.") (Eighth Amendment); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) ("[T]he Officers lay on top of Champion, a mentally retarded individual who had stopped resisting arrest and posed no flight risk, and sprayed him with pepper spray even

assault by a prison guard on an inmate is grounds for an Eighth Amendment excessive force claim." *Coley*, 799 F.3d at 538 (citing *Pelfrey*, 43 F.3d at 1037; *Moore*, 2 F.3d at 700-01). To the contrary, there is no Eighth Amendment violation "where a prisoner was sprayed with pepper spray after repeatedly disobeying orders." *Roberson*, 770 F.3d at 406 (citing *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992) (collecting cases)) (quotation marks omitted).

In this case, when applying Plaintiff's version of the facts, Plaintiff was assaulted numerous times without provocation and while he was immobile. In Plaintiff's view, he was cooperating, laying on his stomach with his hands cuffed behind his back for approximately ten seconds, prior to being punched in his face, pepper sprayed, and slammed through the in the Washington Bravo Unit door. Plaintiff was similarly handcuffed and on the ground when he was pepper sprayed behind the yard shack, and was in leg irons when he was pepper sprayed and punched in his stomach multiple times in the infirmary—both of which occurred shortly after he had been pepper sprayed at least twice and had recently been in an unconscious and unresponsive state. Based on these facts, even if Plaintiff was being difficult, a jury could reasonably conclude that Defendants' actions constituted a violation of Plaintiff's rights. Moreover, this Court finds Plaintiff's rights against Defendants' cruel and unusual punishment were clearly established given that this Court found a genuine issue of fact as to whether Defendants' use of force was objectively reasonable. Therefore, summary judgment based on qualified immunity is **DENIED**.

---

after he was immobilized by handcuffs and a hobbling device. The use of such force is not objectively reasonable.") (Fourth Amendment); *Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994) ("[The defendant] denied spraying mace on plaintiff once he reentered the car and did not state that plaintiff resisted being handcuffed or was violent once he was back inside the car [and, thus] there is no evidence that it was necessary to mace plaintiff once he returned to the car because he was unruly or refused to be handcuffed.") (Fourth Amendment); *Foos v. City of Delaware*, 492 F. App'x 582, 591 (6th Cir. 2012) ("'[C]ontinuing to beat a neutralized suspect constitutes an unconstitutionally excessive use of force, as does continuing to spray mace on a suspect who has already been blinded and incapacitated.'") (quoting *Goodrich v. Everett*, 193 F. App'x 551, 556 (6th Cir. 2006)) (Fourth Amendment).

### 5. *Eleventh Amendment*

This Court last turns to Defendants' argument that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. Defendants are correct that Plaintiff sued them in both their individual and official capacities. (ECF No. 1 ¶ 5). A lawsuit against a state official in his or her official capacity is deemed a lawsuit against the official's office. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). The Eleventh Amendment precludes lawsuits against a state and its departments, *see* U.S. Const. amend. XI, and the State of Ohio has not waived immunity in the federal courts, *see Wolfel v. Morris*, 972 F.2d 712, 718 (6th Cir. 1992). Therefore, Defendants cannot be sued in their official capacities, which Plaintiff concedes. Accordingly, summary judgment with respect to Plaintiff's claims against Defendants in their official capacities is **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Strike ECF No. 31 (ECF Nos. 33, 34) is **DENIED** and Defendants' Motion for Summary Judgment (ECF No. 25) is **GRANTED IN PART and DENIED IN PART**. Specifically, Defendants' Motion for Summary Judgment (ECF No. 25) is granted with respect to claims against Defendants in their official capacities and all claims against Defendants John Doe Corrections Officers 1-5. Defendants' motion is denied with respect to all other claims.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: March 11, 2024**

24